No. 31,268

AMELIA JANE LAWSON, *Appellee*, v. BROTHERHOOD OF AMERICAN
YEOMEN, *Appellant*.

(25 P. 2d 344.)

Opinion filed
October 7, 1933.

*George R. Allen* and *Richard F. Allen,* both of Topeka, for the appellant.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action on a beneficiary certificate for $5,000 claimed to be due because of death by accident of the insured. Defendant contends it is liable for no more than paid-up insurance in the sum of $293. The trial court made findings of fact and conclusions of law and rendered judgment for plaintiff in the sum claimed. Defendant has appealed.

Defendant is a fraternal benefit society organized under the laws of Iowa and authorized to do business in Kansas, and will be referred to herein as the association. It has local lodges, known as homesteads, a legislative body known as the supreme conclave, and a board of directors with powers to determine, within certain limits, classes and forms of certificates, the benefits provided for therein, and the contributions or premiums to be paid by members therefor, and to modify or change these from time to time; also, under some circumstances, to declare refunds of premiums paid. It issues several classes and forms of certificates, some of which are in the form ordinarily issued by fraternal benefit societies, others of which are quite like policies normally issued only by old-line life insurance companies. The certificate sued on in this action is a "twenty-payment life certificate, legal reserve form C," with a level premium rate. It was to become fully paid up for its face amount in twenty years if the payments due thereon for that time were made. By its terms the association agrees to maintain with the insurance commissioner of the state of Iowa the accumulations necessary to provide the benefits promised by the certificate, being the usual reserves computed by the American experience table of mortality and four per cent interest. It provided two classes of benefits: (a) death benefits, payable to the beneficiary, $2,500 if death was from normal cause, $5,000 if from accident; (b) disability benefits, payable to the insured, $1,250 for total, permanent disability through accident or disease if the certificate had been in force for two years, or the same sum for partial disability for the loss of sight of both eyes, or the loss of both legs above the ankles, or of both arms above the wrist, or of one arm above the wrist and one leg above the ankle; or, $625 for the loss of one arm above the wrist, or one leg above the ankle. Under the heading, "Paid-up and extended pro-

tection, withdrawal equities and loan values," it provided, in accordance with a table printed thereon, at the end of the four years, paid-up protection in the sum of $293, cash withdrawal or loan value in the sum of $80, and extended protection for a term of four years and 133 days. In this connection it further provided:

"After the payment of monthly or other payments for three or more full years, one of the following options shall become effective:

"1st. *Automatic paid-up protection.* In case of the nonpayment of any monthly or other payment when due hereon, then, without any action on the part of the member named herein, this certificate will become a paid-up certificate for the amount shown by the adjoined table of paid-up protection and such amount will be payable in one sum under the conditions of this certificate upon the death of the member; or,

"2d. *Cash withdrawal value.* Upon a full and valid surrender of this certificate while it is in full force, the association will pay the then cash withdrawal value as shown by the adjoined table of value; provided, that the association may defer such payments for a period not exceeding sixty days from the date of the application therefor; or,

"3d. *Extended protection.* Upon written request of the member named herein, made while this certificate is in full force, the association will extend and continue in force the full amount of this certificate as term protection for the number of years and days shown by the adjoined table of extended protection.

"4th. *Automatic monthly payment loans.* Upon written request of the member named herein, made while this certificate is in full force, the monthly or other payments thereafter falling due, if not paid, will be charged against this certificate as a loan bearing compound interest at the rate of six per cent per annun until such time as the accumulated loans, together with any other indebtedness with interest thereon, shall equal or exceed the cash withdrawal value hereof, in which case this certificate shall thereupon become null and void and be surrendered to the association in consideration of the cancellation of the indebtedness. While this certificate is thus continued in force, the member may resume the payment of monthly or other payments without furnishing evidence of good health, and the accumulated loans and interest may be repaid or allowed to stand as a lien against this certificate.

"5th. *Cash loan.* . . ." (Not important here.)

The certificate contained this agreement:

"It is agreed by the member holding this certificate that the certificate, the charter or articles of incorporation, the by-laws of the association and the application for membership, and the medical examination, signed by the applicant, with all amendments to each thereof, shall constitute the agreement between the association and the member; and any changes, additions or amendments to said charter or articles of incorporation and by-laws of the association enacted subsequent to the issuance of this certificate shall be binding upon the member and his beneficiary, or beneficiaries, and shall govern and control the agreement in all respects in the same manner as if such

changes, additions or amendments had been made prior to and were in force at the time of the application for membership."

The certificate was issued March 2, 1926, to John Edward Lawson, of Arkansas City, Kan., a member of Homestead No. 1277, and named Amelia Jane Lawson, mother of the insured, as beneficiary. Payments for the certificate named thereon to be paid by the insured were, if made annually, $57.98; semiannually, $30.10; quarterly, $15.20; monthly, $5.35; children's home fund, monthly, 10 cents. The amount of the homestead dues was not indorsed on the certificate, but it is agreed they were 20 cents per month. The certificate had attached a rider, quoting from a by-law: "Monthly payments are due on the first of each month. The member shall have until the last day of the month in which to pay the same before being suspended." Also, a statement that it would cost less if remittances were made quarterly, semiannually, or annually.

The insured paid an annual payment in March, 1926, another in March, 1927, another in March, 1928, and another in April, 1929. He made no payment in March or April, 1930. He was killed in an airplane accident April 24, 1930. The principal controversy here is, For what sum was the certificate in force at the time of his death? On behalf of the association it is contended that under the certificate, and specifically under paragraph 1, relating to "paid-up and extended protection, withdrawal equities and loan value," it automatically became a paid-up certificate for $293 in accordance with the table shown on the certificate. Plaintiff, the beneficiary named in the certificate, contends this interpretation of the certificate is incorrect and that she is entitled to the full $5,000 benefit provided in the certificate for the accidental death of the insured, for the reasons:

*First,* the certificate alone is not the contract between the parties. The contract consists of the certificate, the charter or articles of incorporation, the by-laws of the association, the application for membership and the medical examination, with all amendments thereof made between the time the certificate was issued and the death of the member. One of the by-laws (sec. 118), in force at the time the certificate was issued, reads as follows:

"The correspondent shall not accept either dues or assessments alone. Each and every member notified that an extra or increased benefit assessment has been levied and ordered by the board of directors in the manner provided, who shall fail to pay the same on or before the last day of the month for

which said extra or increased assessment has been levied, or who shall fail to pay the regular payment, including his dues, on or before the last day of the month in which the same falls due, or who shall engage in any of the prohibited occupations mentioned in these by-laws, or who shall become addicted to the intemperate use of intoxicating liquors, opium or morphine, so as to impair his health, or who shall be convicted of a felony, or who shall attempt to commit suicide, shall be automatically suspended, without any action on the part of any homestead or any officer or officers of this association, and the certificate held by such member shall immediately become null and void, and all payments made thereon shall be forfeited, payments to the local correspondent notwithstanding. Provided, that a member holding a form C certificate on which he has paid the monthly or other required payments for three full years or more shall be entitled, within thirty days from the date of his said suspension, to exercise one of the options specified in his said certificate relating to paid-up and extended protection or cash withdrawal value, but only upon the terms and conditions contained in his said certificate; *provided, however, no such election shall be valid unless in writing, signed and duly acknowledged by the member before a notary public or witnessed by the correspondent of the member's homestead within said thirty-day period and received by the secretary of the association within forty days from the date of suspension. If the member exercises no such option within said thirty-day period, then his certificate shall be in force for only the amount and period provided by the terms thereof.*" (Italics ours.)

Under this by-law none of the options named in the certificate under the heading, "Paid-up and extended protection, withdrawal equities and loan value," automatically went into effect, for the reason that the by-law gave to a member holding form C certificate, on which he had paid three years or more, thirty days from the date of his suspension in which to exercise the option. It is conceded in this case that the insured had all of the month of March, 1930, in which to make his payment, and that he did not become suspended before midnight on March 31. By this by-law he had thirty days thereafter in which to make his election of options. He died within the thirty days without having made such an election, but soon after his death, and within the month of April, his beneficiary, the plaintiff herein, did make an election to take extended insurance, which, under the table shown by the certificate, was for four years, 133 days, and under which the certificate would have been in full force at the time of the death of the insured. There is much argument in the brief as to whether plaintiff could make such an election, she contending that she could do so under the law applicable to such a situation, while defendant contends that the right of election was personal to the insured and could not be exercised by anyone else,

and certainly not after the death of the insured. We find it unnecessary to rule on this point for the reason that this by-law was amended in January, 1928, and again in June, 1929, as section 108, which last amendment was in force at the time of the death of the insured. It reads:

"The local secretary shall not accept either dues or assessments alone. Each and every member who shall fail to pay the local secretary of his homestead the regular payment, including his dues, on or before the last day of the month in which the same falls due, or who shall within two years from the effective date of his certificate engage in any of the prohibited occupations mentioned in these by-laws, or who shall become addicted to the intemperate use of intoxicating liquors, opium or morphine so as to impair his health, or who shall be convicted of a felony, or who shall attempt to commit suicide, shall be automatically suspended without any action on the part of any homestead or any officer or officers of this association, and the certificate held by such member shall immediately be null and void and all payments made thereon shall be forfeited, notwithstanding any payments made to the local secretary after the date of such suspension unless the same are made in full compliance with the by-laws of the association relating to reinstatement of members. *Provided, however, if the certificate of a member which provides for paid-up or extended insurance on default of payments, after the payment by the member of the required payments for three or more full years, is suspended as herein provided, it shall be continued in force for that part of the death benefit only and for the period provided by the terms of said certificate in the event of default of payments by the member."* (Italics ours.)

From the statement of the contents of the certificate hereinbefore made there were, broadly speaking, two classes of benefits: (*a*) death benefit; (*b*) total or partial disability benefit. It will be observed that this by-law did not continue the certificate in force for the total or partial disability benefit, but did continue it in force for death benefit, which is the class of benefit sought to be recovered for in this action; and by this by-law the certificate was to be continued in force "for the period provided by the terms of said certificate." The only period specifically provided by the terms of the certificate for it to be continued in force, it having been paid on for four full years, is four years and 133 days. This amended by-law, binding on the association and the member, continued the certificate in force for the death benefit for time later than the date of the death of the insured.

Here the parties agreed that the contract between them should include the by-laws then existing, or as they should be later amended.

Under such circumstances the amended by-law became a part of the contract.

(*Reno Lodge v. Grand Lodge,* 54 Kan. 73, 37 Pac. 1003; *Miller v. National Council,* 69 Kan. 234, 76 Pac. 830; *Kirk v. Aid Association,* 95 Kan. 707, 149 Pac. 400; *Messenheimer v. Fraternal Aid Union,* 103 Kan. 552, 175 Pac. 679; *Gray v. United Workmen,* 111 Kan. 88, 206 Pac. 311; *Dey v. Knights and Ladies of Security,* 113 Kan. 86, 213 Pac. 1066; *Haney v. Farmers Alliance Ins. Co.,* 134 Kan. 5, 4 P. 2d 460.)

Appellant argues if there is inconsistency between the terms of the certificate and the by-laws the terms of the certificate should control. We do not understand that principle to be applicable here. Where the contract consists of the by-laws, the certificate and certain other documents, all should be considered. They should be construed together. If there is inconsistency in them when so considered the court will, when interpretation is possible, so construe them as to give the insured the benefit of provisions favorable to him.

(*Pyramids v. Drake,* 66 Kan. 538, 72 Pac. 239; *United Workmen v. Smith,* 76 Kan. 509, 92 Pac. 710; *United Workmen v. Crandall,* 80 Kan. 332, 102 Pac. 843; *Forney v. Insurance Co.,* 87 Kan. 397, 403, 124 Pac. 406; *Tucker v. Kirkpatrick,* 106 Kan. 881, 189 Pac. 946; *Ellis v. Fraternal Aid Union,* 108 Kan. 819, 823, 197 Pac. 189.)

We conclude the association is bound by this amended by-law, and under it plaintiff is entitled to recover.

Plaintiff claimed the right to recover for another reason. In July, 1928, the defendant association prepared and had printed a four-page leaflet, spoken of in this record as a circular, one of which it caused to be mailed to the insured, John Edward Lawson. This leaflet was entitled: "The Stability of Legal Reserve Insurance as Issued by The Brotherhood of American Yeomen, Based upon an Actuarial Analysis of our Certificates." In part it reads:

*" 'Protection First' the Watchword.*

"The one idea which can never be lost sight of in devising a certificate form is that there can be no slightest chance that the promised benefits will not be paid. The members of our society have the very best assurance that the Yeomen will meet all its promises; namely, the fact that our rates are based on the most conservative mortality standard in general use, the American experience table of mortality, and the fact that the society maintains at all times the required reserve according to that table of mortality and 4 per cent interest."

There is more of a similar nature, and a discussion of uses which may be made of refunds, and a further discussion of optional payments to beneficiaries. Then follows:

*"Protection in Case of Lapse.*

"The beneficiary of the members must not only be protected as long as the member remains in good standing and keeps up his premium payments, but as long as the society can protect that beneficiary by means of the reserve.

"Accordingly, in case of lapse, after a certificate has been in force for three or more years, the following nonforfeiture options will carry the protection of the member's beneficiary beyond the date when he becomes suspended or lapsed:

"1. *Automatic Continued Protection.* If a member becomes suspended for nonpayment of premiums, after his certificate has been in force for three years or longer, the society, without any directions from him, will take from his reserve the amount of his monthly premiums, and thus keep his certificate in force for as many months as the money in reserve will carry. Later, if the member wishes to reinstate, he can do so without a medical examination. The monthly premiums so borrowed from the reserve are deducted from the death benefit in case of death, and as long as they remain unreturned they bear six per cent interest. These borrowed premiums can be repaid at any time, or they can remain unpaid as long as the total, with interest, does not exceed the required reserve.

"2. *Extended Protection.* In order to continue the insurance after lapsation on this option, the member must give written directions to that effect, to the home office. . . .

"3. *Paid-up Protection.* This option also requires written notice. . . ."

This is followed by a paragraph concerning terms of payment of premiums or contributions, and a statement of the forms of certificates issued by the association, including "twenty payment life," which is the form of certificate sued on in this action.

The fourth paragraph, under the heading "paid-up and extended protection, withdrawal equities and loan value" in the certificate, provides briefly that upon written request of the member his payments, if not made, would be charged against the loan value of his certificate and keep it in force as long as the loan value would do so. If the provisions of this leaflet are to be given effect, the association, without written request from the member, would use the reserve or loan value of the certificate for that purpose. This was to be done to protect beneficiaries. The reserve or loan value of this certificate in March, 1930, was $80. Had it been applied toward the payment of premiums, as the leaflet stated it would be applied, without request from the member, or as it would have been applied under the certificate had the member requested it, the certificate

would have remained in force for a period much later than the death of the insured. The association contends it is not bound by what was stated in this leaflet, for the reason that it was nothing more than a circular prepared and mailed out for advertising purposes and was descriptive only of new forms of certificates then being issued, and had no reference to certificates previously issued, such as is sued on in this action; that it was not signed by the officers of the association, and that it did not purport to amend any existing by-laws. By the pleadings in this case it was charged by the plaintiff, and admitted by the defendant, that it was prepared and sent out by the association; hence, whether it was signed by the officers of the association is of no consequence. As previously noted, the board of directors of the association had extensive powers. A by-law in force at the time the certificate sued on in this action was issued, and ever since, provides that the board of directors, in the interim between meetings of the supreme conclave, shall have power to adopt, amend, repeal, promulgate and enforce all rules and regulations pertaining to (1) the amount of death, disability, or other benefits that may be provided or agreed to be paid to members; (2) the rate of monthly or other payments to be made by members; (3) the reinstatement of members and exchange of certificates from one form to another; (4) "and all other matters regarding a plan or system of benefits as distinguished from the social or general features of the association. . . ." The record discloses these extensive powers of the board of directors were exercised from time to time. Even the form of the certificate sued on in this action, in one important respect, was not specifically provided for by the by-laws, nor the rate of payments by the member set out by the by-laws, but these matters were determined by orders or resolutions of the board of directors. So, here we have provisions affecting the rights of members under their certificates concededly prepared and sent out by the proper officers of the association, who had authority under the by-laws to do the very thing attempted to be accomplished, namely, authorize the use of the reserve to keep a certificate in force for the benefit of beneficiaries without requiring a written request therefor from the member. There is nothing in the leaflet or circular which indicates that it applied to new forms of certificates only, or that it was intended solely for advertising purposes for getting new members. On the other hand, it describes the specific certificate issued to the insured in this case. It was sent

to him by the association. He read it and understood that it applied to his certificate. There is oral testimony to that effect. Appellant complains that such oral testimony was admitted, but certainly it goes no further than the association would expect the member to do if there were no such oral testimony; namely, that he read it, understood that it applied to his certificate, and further understood that if his payments were not made promptly the association, without written request on his part, would use the reserve of his policy, which he knew was more than enough to pay his annual premium, to keep it in force for the protection of his beneficiary. Certainly the association is not in position to say that a member who complies with information conveyed to him by the association under authority of its by-laws has acted to his prejudice and rendered his certificate void. As bearing on this point, see *Ellis v. Fraternal Aid Union*, supra; *Green v. Insurance Co.*, 112 Kan. 50, 54, 209 Pac. 670; *Bierback v. Mutual Benefit Health & Accident Ass'n*, 100 Neb. 675, 161 N. W. 251; and *Insurance Co. v. Eggleston*, 96 U. S. 572, and the authorities collected in Rose's notes thereon.

Plaintiff argues two other questions as to the liability of the association, but in the view we have reached on questions hereinbefore determined it is not necessary to consider them.

Finally, appellant contends it should not be required to pay because there was no formal proof of loss. Plaintiff alleged that formal proof of loss had been waived, and defendant put that question in issue by the answer. The trial court found the association was notified promptly of the death of the insured; that it immediately admitted liability for $293 only; that a little later the association sent a representative to the beneficiary, who admitted liability for the amount of paid-up insurance and offered to pay it. When plaintiff refused to accept that sum, $500 was offered, and that was refused. There has never been a contention that the defendant was not liable in some amount; neither was there any contention in the trial court that defendant was not liable by reason of the manner in which the death of the insured occurred. It is conceded now that formal proof of death, on blanks furnished by the association, could have been made readily. Under these circumstances the making of such proof was a formal matter only. The lack of it was no handicap to the association, and the trial court correctly held such proof had been waived.

The judgment of the court below is affirmed.